[Civ. No. 14779.   Second Dist., Div. One.   May 3, 1946.]

JOHNSTON PIE COMPANY (a Partnership) et al., Respondents, v. ACME EGG & POULTRY CO. (a Partnership) et al., Appellants.

Myer B. Marion and Eugene L. Wolver for Appellants.

Albert G. Bergman for Respondents.

YORK, P. J.—This is an action to recover damages for an alleged breach of a so-called "requirements" contract, by the terms of which defendants agreed to sell and plaintiffs agreed to buy 90,000 pounds of frozen "Gold Bond" eggs, specifically designated as

"Approx. 25,000 'Gold Bond' lbs. Frozen Whites @ 12½¢ per lb.
  "     65,000 'Gold Bond'  "      "     Wholes @ 19½¢   "    "."

Said contract covered the period from April 16, 1941, to April 1, 1942, and provided: "This contract is made for the requirements, but is not to exceed 90,000 pounds total. . . . Each delivery to be made separately by the seller within reasonable time after being requested to do so by buyer. . . ."

The complaint alleged that early in December, 1941, plaintiffs orally requested defendants to increase their prior daily deliveries of eggs from 240 to 810 pounds per day to meet plaintiffs' requirements, but that defendants failed to increase said deliveries; that on January 14th and again on February 11, 1942, plaintiffs made written demand upon defendants for the delivery of a minimum of 810 pounds of eggs per day, and requested that said amount be increased so as to make delivery of the full 90,000 pounds before the expiration date of the contract; that from the first part of December, 1941, until April 1, 1942, defendants delivered not more than 240 pounds of eggs daily. It is also alleged in a second cause of action that plaintiffs on March 24, 1942, further notified defendants that they intended "to rely strictly upon and to have you (defendants) conform exactly with all of the terms and conditions of said contract and according to the previous notices sent you." Also, that at the time the contract expired defendants had delivered a total of 47,000 pounds of eggs, leaving an undelivered balance of 43,000 pounds; that by reason of defendants' failure and refusal to deliver the remaining 43,000 pounds of eggs, plaintiffs were compelled and obliged to purchase similar eggs in the amount of 43,000 pounds in the open market at a greatly increased cost, all to their damage in the approximate sum of $3,000.

From a judgment in favor of plaintiffs for the sum of $2,565.90, defendants appeal.

It is here urged by appellants that the trial court committed prejudicial error in ruling that "the burden of proof rested upon the sellers to prove the requirements of the purchasers."

Early in the trial the court made the following comment: "I think we will take a recess at this time for about five minutes. Counsel might consider this one question, which has not been suggested to the Court, and that is where is the burden of proof with reference to requirements. The showing is that the plaintiff demanded that the contract be filled to the extent of 90,000 pounds. Isn't there a presumption that

that represented its requirements, and if it did not represent its requirements, isn't the burden on the defendant to show that it did not? You might think that over during the recess.''

Later in the same day the court called attention to the case of *New York Central Iron Works Co.* v. *United States Radiator Co.*, 174 N.Y. 331 [66 N.E. 967], and commented thereon as follows: ''in which it is stated that a general manager in that case was entitled to testify to the requirements of the business as such, and that it did not call for a conclusion, but a fact, and a fact with which he was familiar. Furthermore, the case seems to imply that the burden is on the defendant, if he denies that the plaintiff needed for its requirements, the number of pounds, to affirmatively allege that and set it up as a defense.

''Mr. Marion: Is that your ruling, your Honor?

''The Court: I say, that is the ruling of that case.

''Mr. Marion: May I ask whether or not that is the ruling and the position that your Honor is going to take in this case, that the burden is upon the defendants to show that the re-requirements of the plaintiff in this action were not 90,000 pounds per year?

''The Court: Yes.

''Mr. Marion: That is the ruling?

''The Court: Yes.

''Mr. Marion: I submit then, your Honor, of course, in a ruling which is adverse is deemed to be objected to, but for the sake of the record I wish to state the fact that we, representing the defendants, do not concur in that ruling; that we concede the contract is predicated upon a condition or contingency; that it is obligatory on plaintiff as the promisee to whom the eggs were to be delivered, to show the fulfillment or the happening of the condition or the contingency, and that only when it has been established by the plaintiff in this action that the condition or the contingency upon which the obligation, if it exists at all, may come into being, has sprung into being; then only does the obligation to deliver on the part of the seller take place.

''The Court: I am inclined to think the burden is on the defendant here, but whether it is or not, of course at the moment there is proof on that very point. Now, whether the burden of proof rests on the one or the other I do not think is going to be so important. I just mentioned it as one of the cases that bears on that point. . . . As I see the case, the

whole question remaining in this case—— there are only two as I construe the contract: One is, did the plaintiff require during the period of the contract, the 90,000 pounds from the defendant Acme? It either did or it did not. Now that is an issue upon which you can introduce evidence, any proper evidence, whether it is by examination of the witnesses of the plaintiff or of the defendant, so long as other objections to it are not sustained, but that is the issue.''

There is nothing in the foregoing discussion which indicates a definite intention on the part of the court to require appellants to assume the burden of proof. The trial judge in effect stated he had examined a case from another jurisdiction holding that a defendant was required to affirmatively allege and set up as a defense a lack of need, but that since respondents herein had assumed the burden of proof by the introduction of evidence as to their requirements, the ultimate question was whether respondents required the 90,000 pounds of eggs; and that he would consider any evidence introduced by appellants as to respondents' lack of requirements, whether set up as an affirmative defense or not.

Respondents, instead of simply introducing the contract and establishing appellants' failure to deliver in accordance therewith, which would have made it incumbent upon appellants to introduce evidence that respondents did not need the total amount of $90,000 pounds of eggs, went beyond the strict rules of law and negatived a defense by showing that their requirements were in excess of the amount agreed upon.

Respondent Victor Swan, one of the three copartners of Johnston Pie Company, testified that the company needed 880 pounds of eggs and more per day from November 1, 1941, to the date of the expiration of the contract; and that for the period of the contract their needs exceeded 90,000 pounds of frozen eggs. On cross-examination, said witness stated that when the contract was entered into, the copartners estimated they would need 90,000 pounds, which they later found to be inadequate. He also testified that they received a sample of frozen eggs from Nick Cirrino during the period covered by the contract, but received no other frozen eggs from anyone.

Respondent Theodore Tepper, one of the copartners, testified that at the time the contract was made, they estimated their needs for the ensuing year would be ''90,000 pounds of frozen eggs, frozen wholes and whites''; that beginning in October, 1941, they found that the 240 pounds a day that

were being delivered were totally inadequate to meet the orders which they had on hand for the manufacture of pies and that late in October they made a demand on appellants "for an increase in the frozen eggs"; that because of the increased volume of business after October, 1941, respondents estimated they would need about 900 pounds of frozen eggs per day; that this estimate was "based on the previous year's business, and also the fact that during that year business was increasing more than it had been my experience in previous years"; that during the months of November and December, 1941, the daily average remained constant and they "did need at least 900 pounds of frozen eggs a day"; that they were unable to get that amount of eggs, and "actually did three different things . . . in the first place we could not make the type of pies that required those eggs, and in the second place we had to make the pies that did require those eggs, or that type of eggs, with a greatly reduced quantity. . . .. The pies that we made with frozen eggs we reduced in quantity the eggs that went into the mix, in other words we cut down the amount of eggs that were used in that type of pies. It was detrimental to the quality of the pie . . . we could not make a certain type of pie due to the lack of frozen eggs." This witness also testified that after making oral demand on appellants for increased delivery of eggs under the contract and not being satisfied, a written demand was made upon appellants for the delivery of 810 pounds of frozen eggs per day for the remainder of the term; that "810 pounds daily would fulfill the contract"; that for the entire period of the contract, to wit: from April 19, 1941 to April 1, 1942, respondents needed in excess of 90,000 pounds of frozen eggs and could have used 150,000 pounds; that from the end of November, 1941 to April 1, 1942, 240 pounds of eggs per day were the most that was ever received from appellants; that in order to supply the deficiency, they "bought fresh eggs, cracked them, in other words, shell eggs" and substituted them for the frozen eggs. Asked to describe the difference between a frozen egg and a fresh egg in the preparation of a pie, Mr. Tepper stated: "Oh, there could be any number of differences. In the first place, when you freeze an egg you change the egg entirely. A fresh egg has a separate white and a separate yolk. A frozen egg, the whites and the yolks are merged, in other words you get an entirely different product. A frozen egg is short and the fresh egg is tough."

Copartner Elwood Johnston testified that from November, 1941, to April 1, 1942, the partnership needed 810 pounds, or more, of frozen eggs per day in the conduct of their pie business; that during the period covered by the contract respondent pie company did not purchase any frozen eggs from other sources than that of appellant egg company, but did purchase fresh eggs after the breach of the contract. In answer to the question: "How did you know you would need 810 pounds . . ." said witness testified as follows: "The same way that we knew we were going to need 90,000 pounds of eggs, we just guess at it, and we hit it right the same way we sign a contract, we anticipate what we are going to need, sometimes we hit it, sometimes we miss it. In this particular case we ran short. . . . We did the best we could. For a while we quit washing the tops of our pies with eggs, we had to use milk and sugar on top of them. Then we had so many complaints we had to get eggs, wherever we could get them. . . . Q. And outside of the efforts you made to secure these eggs from Mr. Cirrino of the Holland Egg Company and of F. W. Getchel, you made no further efforts to secure your frozen eggs from any other stores after you made your demands upon the defendants to fulfill your increased needs, did you? A. I won't say, because I don't remember, just like I told you, I don't remember for sure about the Dundee, I know the eggs were awfully high, they went to 32 cents a pound, and we tried to get the eggs of equal quality, and I don't know of any eggs on the market outside of one brand that I would consider equal quality with Gold Bond Eggs. . . . We try to keep the cost of the pies somewhere within reason, and at that particular time of year (Jan. 14, 1942, to Apr. 1, 1942) eggs are so high that we always use checks, the same as any bakery does, and we tried to get fresh checks, and we could not obtain all the fresh checks we needed, so we just had to make the pies accordingly, Mr. Tepper makes the pies with the eggs that he has."

Appellants urge that the evidence is insufficient to support the main findings of fact because respondents "failed to offer competent evidence that during the period of time covered by the contract their requirements for frozen eggs were 90,000 pounds." In this connection it is argued that, since appellants furnished all of the frozen eggs requested of them over a period of eight months or two-thirds of the con-

tract period, to wit: 38,040 pounds of eggs (Findings III and VI in part), the court's findings II and VI in part, to the effect that respondents required in excess of 90,000 pounds of frozen eggs during the period of the contract and that on January 14, 1942, there remained undelivered 51,960 pounds of eggs, are inconsistent with said findings III and VI in part, since they arbitrarily presuppose that during the remaining one-third period that the contract had to run respondents' requirements increased 270 per cent.

This contention is apparently predicated upon the hypothesis that, since respondents accepted deliveries of approximately 240 pounds of frozen eggs per day until they made demand for increased deliveries, they needed nothing in addition thereto for the remaining term of the contract.

The foregoing résumé of the testimony given by the three copartners completely refutes appellants' argument. Moreover, the contract which was drawn by appellants provided that "each delivery to be made separately by the seller within a reasonable time after being requested to do so by buyer," consequently respondents could request an increase in deliveries at any time during the period of the contract, keeping in mind that the total deliveries for the term should not exceed 90,000 pounds.

Appellants next contend that they demonstrated that respondents' requirements for frozen eggs approximated the quantities delivered to them, because it was shown by the witness Bryson that respondents had received a large quantity of frozen eggs from F. W. Getchel & Son. As to this point, the record discloses that the delivery of eggs by said company was pursuant to a contract between Getchel & Son and the former owner of the Mary Elizabeth Pie Company, and that the Mary Elizabeth Pie Company was acquired by respondents on October 1, 1941. As hereinbefore stated, the witness Swan testified unequivocally that "Johnson secured no frozen eggs" from any concern other than Acme Egg & Poultry Company during the term covered by the contract here under consideration.

It is also contended that the evidence proved that the anticipated needs of respondents at the time of the execution of the contract were for approximately 90,000 pounds of eggs of all kinds, including fresh and frozen. The contract herein called for deliveries of frozen eggs, and when appellants refused to deliver the requested increased amount of frozen

eggs, respondents were forced "to get eggs wherever we could get them." In the words of the respondent Johnston: "At first we cut down on the eggs, because eggs were so high on the market, first I tried to get them from the Holland Egg Company, and he said there were no more frozen eggs, that everybody had their contracts originally. . . . So we changed the formulas of our pies for a while, and we were washing the top of our pies with frozen eggs and we had to discontinue doing that, and wash them with milk and sugar, which, that was the place where we were using and needing lots of frozen eggs, due to the fact that mince pies increased so much at that time of the year, we needed a lot of frozen eggs to wash them with, then we got by the best way we could, and we had several complaints, and I started buying more fresh eggs, as many fresh eggs as I could possibly get, and even fresh eggs, we could not buy the fresh checks we needed, and our pies suffered due to the fact that we had to cut down on the eggs in the mixes."

Appellants urge that the evidence clearly shows that respondents purchased fresh broken eggs during 1941 at prices less than the contract price, and that when the price of fresh eggs subsequently increased, demand was then made upon appellants for increased deliveries to 810 pounds per day. The contract here in question called for deliveries of frozen eggs as requested by respondents, hence the current price of fresh eggs on the market would not be material.

An examination of the record herein discloses sufficient substantial evidence to support the findings and the judgment.

For the reasons stated, the judgment is affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing was denied May 24, 1946, and appellants' petition for a hearing by the Supreme Court was denied July 2, 1946.